UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KATHERINE BISMIS | ) | CASE NO. 1:13CV2075 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Katherine Bismis Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his May 23, 2012 decision in finding that Plaintiff was not disabled because she could perform her past relevant work as a car washer (Tr. 12-23). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

**I.      PROCEDURAL HISTORY**

Plaintiff, Katherine Bismis, filed her application for DIB and SSI on May 24, 2011, alleging she became disabled on December 31, 2005 due to COPD and high blood pressure (Tr. 193). Plaintiff's application was denied initially and on reconsideration. Plaintiff requested a hearing before an ALJ, and, on April 17, 2012, a hearing was held where Plaintiff appeared with counsel and

1

testified before an ALJ, as well as Kevin Yee, a vocational expert (Tr. 28-46).

On May 23, 2012, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 7-27). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review on July 24, 2013.  Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g) and 42 U.S.C. Section 1383(c).

**II.     STATEMENT OF FACTS**

Plaintiff was forty-two (42) years old at the time of the administrative hearing (Tr. 31). Plaintiff has a tenth-grade education and past work experience as a punch press operator, assembler, cashier, stock worker, donut maker, car washer, and nanny (Tr. 31, 194).

**III.    SUMMARY OF MEDICAL EVIDENCE**

Records from MetroHealth Medical Center revealed that Plaintiff was seen at the ED on July 3, 2007, complaining of chest pain off and on for the last few days.  She was also complaining of a headache, depression, and unable to take medications due to social reasons (Tr. 326).  Plaintiff was assessed as suffering from anxiety and was unable to afford the medication (Tr. 327).  She was seen again at the ED on March 28, 2009, complaining of difficulty breathing, and was found to have an asthma exacerbation (Tr. 316-317).  On April 25, 2009, Plaintiff was complaining of bumps across her stomach (Tr. 307).  She was assessed as suffering from folliculitis, likely MRSA, and an asthma exacerbation (Tr. 309).  Plaintiff reported to the ED on May 17, 2009, complaining of difficulty breathing.  She was found to have an asthma exacerbation (Tr. 298-300).  On June 27, 2009, Plaintiff was seen at the ED for chronic headache and left ankle sprain (Tr. 294).

Plaintiff was admitted to Euclid Hospital on March 17, 2009, after complaining of chest pain. She was observed for twenty-four hours in the intensive care unit. Plaintiff's chest pain was found to be atypical. During her stay, an x-ray of the neck showed degenerative arthritis of C5 and 6 (Tr. 273). Plaintiff was admitted to Euclid Hospital on July 16, 2009 for a finger abscess. While awaiting evaluation by Surgery and Plastic, Plaintiff left against medical advice (Tr. 354). Plaintiff returned to Euclid Hospital on July 20, 2009, complaining of an infection in her left middle finger (Tr. 401). Plaintiff underwent an incision and drainage of her abscess in the finger (Tr. 409). Plaintiff was seen at the Emergency Department on August 9, 2009, complaining of shortness of breath, chest pain, and dizziness (Tr. 385). She was assessed as suffering from asthma, heat illness, anxiety, and stress reaction (Tr. 393). On September 23, 2009, Plaintiff was treated at the ED for hypertension and headache (Tr. 381). On October 9, 2009, Plaintiff was treated for facial cellulitis and asthma (Tr. 370).

On November 17, 2009, Plaintiff was admitted to Euclid Hospital, after complaining of shortness of breath, wheezing, and cough. She was found to have asthmatic bronchitis and treated with medication. After improvement, Plaintiff was discharged on November 20, 2009 with a diagnosis of asthma with acute exacerbation, morbid obesity, headache, tobacco use disorder, and dizziness (Tr. 435).

On February 16, 2010, Plaintiff was treated at the ED of University Hospital for complaints of chest tightness, shortness of breath, and wheezing (Tr. 450). She was assessed as suffering from acute bronchitis (Tr. 460). On April 14, 2010, Plaintiff was treated at the ED for complaints of chest pain radiating to her left arm, abdomen, and leg (Tr. 492). On July 12, 2010, Plaintiff was seen at Euclid Hospital ED for complaints of injury to her left foot (Tr. 502). She was assessed as suffering from a sprained ankle (Tr. 509).

Records from Ashtabula County Medical Center reveal that Plaintiff was admitted on May 29, 2011 after presenting with cough, shortness of breath, and dyspnea.  It was noted that Plaintiff was hypoxic when she came in, and was obviously having an asthma exacerbation.  Plaintiff was treated with fluid, antibiotics, IV steroids, and nebulizers.  She was discharged May 31, 2011 with a fair prognosis (Tr. 543).

Records from MetroHealth reveal that Plaintiff was treated at the ED on June 23, 2011 for an asthma attack and left ankle sprain (Tr. 593).  Plaintiff was seen at the ED on July 6, 2011, complaining of an insect bite to her left leg, rash on her chest, and redness about her eyes.  She was assessed with cellulitis and dermatitis (Tr. 580). On August 23, 2011, Plaintiff presented to the ED, complaining of difficulty breathing, worse with hot weather (Tr. 586).  She was found to have a COPD exacerbation (Tr. 588).

On July 20, 2011, Plaintiff underwent a consultative psychological evaluation conducted by Michael W. Faust, Ph.D. (Tr. 606).  Plaintiff reported to Dr. Faust that her eldest child had died in a house fire eight years ago (Tr. 607).  She reported that, at the time of the fire, she was asleep.  Since then, she has been unable to sleep well (Tr. 608).  Plaintiff reported that she had recently moved in with her daughter, and was looking after her daughter's five children (Tr. 607).  Dr. Faust noted that Plaintiff "appeared quite depressed and anxious" (Tr. 609).  Dr. Faust noted that anxiety was manifested by Plaintiff constantly rubbing her hands and legs.  Plaintiff "appeared significantly depressed throughout the exam" (*Id.*).  Dr. Faust reported that Plaintiff "presented as an anxious, emotionally labile, easily upset, timid, and sad individual.  Her affect was blunted" (*Id.*).  Plaintiff reported to Dr. Faust that she experiences auditory and tactile hallucinations of her deceased daughter (Tr. 610).  Dr. Faust reported that his clinical observation indicates that Plaintiff is having difficulty focusing her attention.  She had difficulty concentrating on mental tasks due to anxiety and

depression. When asked to perform serial sevens, she could perform a few, but lost her train of thought. Despite repeated attempts, she could not complete more than a few numbers, which caused Plaintiff to become more upset (*Id.*). Dr. Faust diagnosed major depressive disorder, recurrent, severe with psychotic features. He gave a GAF score of 40, serious symptoms (Tr. 611). Dr. Faust then discussed Plaintiff's ability to perform work-related mental activities. Dr. Faust opined that Plaintiff's lapses in sustained attention make it difficult for her to fully remember what she has been told. In a work situation, she would likely have difficulty recalling what needs to be done to follow through with completing tasks (*Id.*). Dr. Faust noted that, during the interview, Plaintiff struggled to stay focused. She showed attention problems on mental status tasks, and these problems were seen to be secondary to emotional issues (Tr. 612). Dr. Faust noted that, during the interview, Plaintiff was clearly depressed and difficult to engage. She demonstrated difficulty relating to others. She presented as having limitations in her ability to respond to others in the workplace, due to significant emotional issues (*Id.*). Dr. Faust concluded by stating that exposure to work pressures would likely increase Plaintiff's depression and anxiety symptoms. She does not have effective coping skills to manage emotional outbursts (*Id.*).

On August 10, 2011, Plaintiff underwent a pulmonary function test performed by Adia Gerblich, M.D. Dr. Gerblich recorded Ms. Bismis' height at 63.5 inches and weight at 247 pounds. Test results indicated that Plaintiff's FEV1 was fifty percent of predicted at 1.38 liters; after bronchial dialator, it improved to sixty-five percent predicted at 1.78 liters (Tr. 615). Dr. Gerblich found the test results to be valid. It was Dr. Gerblich's interpretation that the test results showed mild restrictive and moderately-severe obstructive ventilatory defect, post-bronchial dialator no restriction, obstructive defect moderate consistent with bronchial asthma (Tr. 623).

5

State agency consultant, Gary Hinzman, M.D., reviewed Plaintiff's file on August 16, 2011. He found that, prior to her date last insured of December 31, 2008, there was insufficient evidence (Tr. 54-55). Dr. Hinzman completed a current physical residual functional capacity assessment (Tr. 71). He found that Plaintiff was capable of lifting twenty pounds occasionally, ten pounds frequently; sitting, standing, and/or walking six hours in an eight-hour workday; she could frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; frequently stoop; and occasionally kneel, crouch, or crawl (Tr. 72). Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation (Tr. 73). On October 19, 2011, Teresita Cruz, M.D., a state agency consultant, reviewed the file and agreed with Dr. Hinzman's assessment (Tr. 103-105).

Karla Voyten, Ph.D., a state agency consultant, reviewed the mental portion of Plaintiff's file on August 16, 2011. Dr. Voyten opined that there was insufficient evidence prior to July 19, 2011 (Tr. 56). Dr. Voyten completed a mental residual functional capacity assessment from July 20, 2011 through the present (Tr. 57-58). Dr. Voyten noted that Plaintiff has difficulty focusing her attention and concentration. She further noted that Plaintiff was able to understand questions, both complex and multi-step. Dr. Voyten opined that Plaintiff is capable of completing simple routine tasks in a setting without fast pace (Tr. 58). Dr. Voyten further noted that Plaintiff reported hallucinations and crying spells. Rapport is difficult to establish. Plaintiff is timid and emotionally unstable. It was Dr. Voyten's opinion that Plaintiff would be able to work superficially with others (*Id.*). Dr. Voyten further noted that Plaintiff did not have effective coping skills, with trouble focusing. Plaintiff's intelligence is estimated to be average. It was Dr. Voyten's opinion that Plaintiff would be able to work in a setting without frequent changes (*Id.*). On October 19, 2011, Kristen Haskins, Psy.D. affirmed Dr. Voyten's assessment, with the additional notation that Plaintiff would be unable to work

in a setting requiring close sustained focus/attention (Tr. 91).

Plaintiff was seen at the Emergency Department of Ashtabula County Medical Center on January 24, 2012, complaining of shortness of breath and chest pain (Tr. 673). She was assessed as suffering from acute asthma, and discharged home (Tr. 679). Plaintiff was seen the following day at Geneva Medical Center, complaining of difficulty breathing. She reported that she was unable to afford her medication. After some improvement, Plaintiff was discharged with antibiotics and steroids (Tr. 631). Plaintiff was treated for asthma and bronchitis at Ashtabula County Medical Center on April 2, 2012 (Tr. 643).

## IV.     SUMMARY OF TESTIMONY

Plaintiff testified that she is unable to work due to COPD, high blood pressure, and depression (Tr. 31). She testified that she is unable to receive medical treatment because she has no income or any medical coverage (Tr. 32).

Upon questioning by the ALJ regarding her COPD, Plaintiff testified that she has an emergency inhaler that she uses constantly. She only gets medical treatment when she goes to the emergency room (Tr. 32). Plaintiff testified that her asthma is triggered by different scents, such as perfume and cleaning supplies (Tr. 34). Heat also exacerbates her asthma (Tr. 35). Plaintiff admitted that, sometimes, her asthma is triggered by her own smoking (Tr. 34). Plaintiff testified that she is trying to quit smoking. She is down to five to ten cigarettes per day from three to five packs a day (Tr. 32). She cannot afford any aids to help quit smoking. She testified that she does not buy cigarettes; other people give them to her (*Id.*). Plaintiff further testified that she quit smoking marijuana at least a year ago (Tr. 34).

Plaintiff testified that, at times, she gets so depressed, she does not want to do anything. She had mood swings, where she thinks people are attacking her and she gets aggravated and wants to cut herself off from everything (Tr. 34). Plaintiff testified that she lost her daughter in a house fire. She then lost custody of her other children to their father, because she could not get herself together. She is very antisocial and moody (Tr. 35). At least one time per week, she is so depressed, she does not want to do anything (Tr. 35). When that happens, she goes in the basement and stays away from everyone. She does not eat, bathe, or change clothes (Tr. 36). Plaintiff indicated that dealing with the other household members' problems helps pull her out of her severe depression (*Id.*).

Plaintiff further testified that she gets distracted easily. This has happened while cooking. She will get distracted, burn the meal, and then get upset and hide from everyone (Tr. 36-37). At times, Plaintiff thinks people are out to get her. Even though she is not doing anything wrong, she feels like she is letting everyone down (Tr. 39). She also testified that she will go four to five days without sleeping. Her mind is constantly racing. She worries about things (*Id.*).

Plaintiff testified that she has trouble going up and down stairs, due to shortness of breath (Tr. 37). She testified that, when talking, she gets nervous, short of breath, and tongue tied, where she cannot express herself (*Id.*). During an eight-hour day, Plaintiff estimated that she could be on her feet "maybe an hour, tops" (Tr. 38). She estimated that she could lift about twenty pounds (*Id.*).

Thereafter, Kevin Yee testified at the hearing as a vocational expert (VE) (Tr. 39). The VE testified that Plaintiff has past work as a cashier, which was performed at the light exertional level, and is unskilled; car washer, also performed at the light exertional level, and unskilled; packager, performed at the medium exertional level, and unskilled; and punch press operator, performed at the medium exertional level, and unskilled (Tr. 39).

The ALJ propounded two hypothetical questions to the VE. The first hypothetical question contained limitations of lifting and carrying twenty pounds occasionally, ten pounds frequently; capable of sitting, standing, and walking each six hours out of eight hours; occasional use of ramps or stairs; never ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; no high concentrations of temperature or high concentration of smoke, fumes, dust, and pollutants; the individual can do simple and routine tasks; the tasks should be low stress; no high production quotas; no piece rate work; no work involving arbitration, negotiation, or confrontation; the individual should have only superficial interpersonal interaction with the public and co-workers; and the contact should be for a short duration and for a specified purpose (Tr. 440). The VE responded to the hypothetical by testifying that such an individual could do Plaintiff's past work as a car washer (Tr. 41). He then identified additional jobs, such as order caller, product marker, and mail room attendant (*Id.*).

The ALJ's second hypothetical was exactly the same as the first hypothetical, except for the individual could only walk two out of eight hours a day, one hour at a time, and could only stand two out of eight hours a day (Tr. 41-42). The VE testified that such an individual would be limited to sedentary exertional level jobs. He gave examples, such as an electronic assembler inspector, laboratory tester, and final assembler (Tr. 42).

The VE was questioned by counsel regarding his response to the first hypothetical question, and whether the car wash attendant is a job normally performed outside. The VE testified that exposure to the weather is occasional (Tr. 43).

The VE was next questioned regarding his response to the second hypothetical, in which he indicated that the jobs identified were not on the production line, but do have production requirements (Tr. 44). The VE testified that jobs on an assembly line have a high production demand, but, if the

9

individual is not on a production line, there is an expectation for a reasonable production (Tr. 45). The VE then went on to testify that, for unskilled jobs, the employer's tolerance is no more than ten percent off task. He further testified that no more than two absences a month is tolerated (*Id.*).

The VE was questioned whether the jobs identified are jobs working next to other people. The VE indicated that, yes, the individual would not be in isolation. He agreed that there was a possibility that such an individual would be exposed to perfume or cologne on the job (Tr. 46).

### V. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits and supplemental security income. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c) and 416.920(c)(1992);

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

### VI. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

### **VII. ANALYSIS**

Plaintiff raises one issue:

I. WHETHER THE COMMISSIONER'S DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE WHEN INSUFFICIENT EVIDENTIARY WEIGHT WAS GIVEN TO THE OPINION OF THE EXAMINING PSYCHOLOGIST, DR. FAUST.

Plaintiff has never been hospitalized for a psychiatric reason (Tr. 608). She had been in counseling only once, for a short time, when her daughter passed away (Tr. 608). In addition, Plaintiff had never been prescribed antidepressant medications (Tr. 608).

The record showed that Plaintiff actually worked throughout the period of her alleged disability; she was a nanny to the children of various relatives with whom she lived (Tr. 52, 223, 545, 547). She continued to work as a nanny through the time of her disability hearing (Tr. 689). The ALJ correctly discounted the report of a one-time psychological consultant who was not fully aware of Plaintiff's active lifestyle.

Plaintiff has alleged that she was disabled while she was working as a nanny for room and board; her work history report states that she was working as a nanny between 1996 and 2011 (Tr. 223). She described her duties as typical nanny duties: taking care of children, cleaning up after the children, cooking, and playing with the children (Tr. 228).

In her disability application, Plaintiff claimed that she was disabled from her COPD and high blood pressure (Tr. 47). Her medical treatment records relate primarily to physical conditions. However, on appeal, she only challenges the ALJ's determination that her mental impairments were not totally disabling.

The record reveals very little treatment relating to any psychiatric conditions, other than a treatment note on January 2006 for anxiety (Tr. 18, 329). Plaintiff was not hospitalized at that time,

and, in fact, she has never been hospitalized for any psychiatric reason (Tr. 608). She sought counseling briefly after the death of her eldest child (Tr. 608). Plaintiff reported that she had never been prescribed psychiatric medications for a mental health condition (Tr. 325, 608), although the records show a prescription for anti-anxiety medication in 2006 (Tr. 328).

The agency ordered a consultative psychiatric examination for Plaintiff as part of her disability assessment. The examining psychologist, Michael W. Faust, Ph.D., met with Plaintiff on one occasion in July 2011 (Tr. 606). Plaintiff told Dr. Faust that she was significantly depressed (Tr. 606). Although she was working as a nanny throughout the period of alleged disability, she told Dr. Faust that she had last worked three years earlier, in 2008 (Tr. 607). She did acknowledge that she had moved in with her daughter that past summer and was looking after her five grandchildren (Tr. 607). However, she did not mention her history of work as a nanny between 2008 and 2011 (Tr. 223, 607).

Although emergency room records showed an active lifestyle (e.g., wrestling with eight children in her care, roller skating, having coffee with friends, helping a friend move, working at an outdoor festival all day, appearing sunburned, and working as a nanny) (Tr. 280, 316, 326, 371, 385-387, 509, 689), Plaintiff told Dr. Faust that she lacked energy, was always fatigued, and was "depressed" most of the time (Tr. 608, 610). She was living with her daughter and five grandchildren, as well as watching her grandchildren, yet she told Dr. Faust that she had "no interest in spending any time with friends or family" (Tr. 610). She even claimed that there were days when she did not get out of bed, and that she spent the majority of time in her room (Tr. 610). However, treatment records from a few weeks earlier stated that she was employed as an in-home nanny (Tr. 547).

As a result of the interview with Dr. Faust and Plaintiff's tearful and anxious presentation at the examination (Tr. 608), Dr. Faust diagnosed major depressive disorder (recurrent, severe) (Tr. 611). Dr. Faust further described Plaintiff's major depressive disorder as including psychotic features, presumably in light of Plaintiff's claim that she experienced auditory hallucinations related to her

13

deceased child (Tr. 608, 611). Despite Dr. Faust's diagnoses of a severe and recurrent depression, Dr. Faust's report showed that Plaintiff arrived on time for her appointment and presented with a neat appearance with clean and appropriate clothing and her hair "neatly styled" (Tr. 609).

Nevertheless, Dr. Faust acknowledged that Plaintiff had no difficulty understanding questions or instructions, including complex or multi-step instructions (Tr. 611). She was functioning in the average range of ability (Tr. 611). But he opined that she would likely have difficulty remembering what she had been told because of lapses in attention (Tr. 611). He asserted that she would "likely have difficulty recalling what needs to be done in the workplace to follow through with completing tasks" (Tr. 611). He also opined that exposure to work pressures would likely increase her symptoms, and that she did not have effective coping skills to manage emotional outbursts (Tr. 612).

Dr. Faust assigned a global assessment of functioning (GAF) score of 40, indicating some serious symptoms (Tr. 611). Despite finding severe symptoms and noting that Plaintiff was not in treatment, Dr. Faust stated in his report that Plaintiff would be "able to seek medical or psychiatric attention if needed" (Tr. 610). He also stated that she was "capable of making reasonable decisions regarding her future" (Tr. 610). Dr. Faust did not prepare a residual functional capacity assessment.

With the benefit of Dr. Faust's report, as well as a review of the entire record, the state agency experts found that Plaintiff could perform a limited range of work that accounted for the limitations from her mental impairments.

In August 2011, expert state agency psychologist Karla Voyten, Ph.D. reviewed the record and prepared a residual functional capacity assessment (Tr. 57-59). Dr. Voyten generally credited Dr. Faust's report and found that Plaintiff had a number of moderate limitations in her ability to perform particular work-related functions (Tr. 57-58). Despite those limitations, however, Dr. Voyten concluded that Plaintiff could complete simple, routine tasks in a setting without a fast pace; could work in a setting without frequent changes; and would be able to work superficially with others (Tr.

14

57-58).

A second expert state agency psychologist, Kristen Haskins, Pys.D., reviewed the record in October 2011, and concurred (Tr. 85). Dr. Haskins added a further limitation that Plaintiff's ability to complete tasks should not require close, sustained focus or attention (Tr. 91).

The ALJ gave significant weight to the reports of both Drs. Voyten and Haskins (Tr. 20). In doing so, the ALJ acknowledged Plaintiff's contention that she had been "subject to a degree of functional limitation because of her various mental and physical impairments" (Tr. 20). Hence, he limited the range of mental work activities that Plaintiff could perform (Tr. 20), and disagreed with Plaintiff's claim that she could not perform any work activities at all (Tr. 20).

The ALJ accounted for Plaintiff's moderate deficiencies in concentration, persistence or pace by limiting Plaintiff to work that was low stress with no high production quotas or piece work (Tr. 21). The ALJ further accounted for Plaintiff's moderate limitations in social functioning by limiting Plaintiff to work that did not involve negotiation, arbitration, or confrontation, or more than superficial interpersonal interactions with the public or co-workers (Tr. 21). The ALJ correctly determined that, even with these multiple limitations, Plaintiff could perform both her own past work and other jobs that existed in significant numbers in the national economy (Tr. 21-23).

Plaintiff only challenges the substantial evidentiary basis for the ALJ's decision that she was not disabled, based upon mental impairment. A one-time consulting examiner need not be assigned controlling weight under the regulations. *See,* 20 C.F.R. Sections 404.1527(d)(2), 416.927(d)(2); *Rahrig v. Comm'r of Soc. Sec.*, 2013 WL 3947155, at *12 n.18 (N.D. Ohio Aug. 1, 2013) ("Opinions from medical professionals who have only examined the claimant on one occasion are not automatically entitled to any special degree of deference"); *Bayhurst v. Astrue*, 2008 WL 5158266, at *7 (W.D. Pa. Dec. 9, 2008) ("the treating physician rule does not apply to a consulting physician's opinion").

15

As to the amount of weight due *any* physician's opinion that is not given controlling weight, Social Security regulations provide that the "more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. Sections 404.1527(c)(4), 416.927(c)(4). The regulations further provide that the "more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion." 20 C.F.R. Sections 404.1527(c)(3), 416.927(c)(3).

To the extent features of Dr. Faust's one-time examination report suggest significant functional limitations, that report was based in considerable measure on Plaintiff's statements at the examination, many of which were contradicted by the record. The record showed that Plaintiff actually worked throughout the period of her alleged disability, a fact that Plaintiff minimized at her interview with Dr. Faust (Tr. 607). She also lived an active lifestyle that was not fully disclosed to Dr. Faust.

Plaintiff claims that the ALJ "fail[ed] to identify any objective evidence inconsistent with Dr. Faust's conclusions" (Pl. Br. at 11). However, the ALJ described evidence that undermined Dr. Faust's conclusion. The ALJ noted that Plaintiff told Dr. Faust that she could hardly get out of bed some days (Tr. 13, 610), she lived with her daughter, and was caring for her daughter's five children (Tr. 13, 607). However, as the ALJ further explained, Plaintiff previously lived with a friend and cared for her friend's children while her friend worked (Tr. 13, 607). At the hearing, Plaintiff testified that she helped get her cousin's children off to school in the morning, tried to help out around the house, and cooked (Tr. 13, 33). This evidence does not support Dr. Faust's report that Plaintiff was so severely depressed that she could hardly get out of bed some days and rarely left her room (Tr. 610). Furthermore, the ALJ noted that, despite Dr. Faust's notation of significant depressive symptoms and his credit of Plaintiff's claim that she sometimes could not leave her room or get out of bed, Plaintiff arrived on time to her appointment with Dr. Faust and appeared well-groomed, with appropriate hygiene (Tr. 13, 606, 609). The medical record also reflected an active lifestyle in contrast

16

with the depressive symptoms Plaintiff related to Dr. Faust. The records showed that Plaintiff helped a friend move and had coffee with friends (Tr. 14, 316, 326). The records further showed that Plaintiff volunteered for a street fair and worked outside all day in the sun (Tr. 385, 387), wrestled with eight children in her care (Tr. 280), and worked as a nanny throughout the period of alleged disability, taking care of children – cooking, cleaning up after them, and playing with them (Tr. 52).

All of this evidence conflicts with the notion that Plaintiff was as limited by her depressive symptoms as she claimed, and as Dr. Faust's report reflected. The ALJ reviewed substantial objective evidence that contradicted the information contained in Dr. Faust's one-time examination report (Tr. 13-14, 18-21).

Despite contradictions in the record, the ALJ, nonetheless, gave Plaintiff a considerable benefit of the doubt and fashioned a reasonable residual functional capacity. Although Dr. Faust's report recognized Plaintiff's ability to understand complex or multi-step instructions and good intelligence (Tr. 609-610), the ALJ acknowledged that Plaintiff may experience limitations in her ability to persist and concentrate (Tr. 20, 21). Hence, he limited her to low stress tasks with no high production quotas or piece rate work (Tr. 21). Also, the ALJ accepted that Plaintiff may experience moderate social limitations, and, therefore, limited her to work that excluded arbitration, negotiation, or confrontation, with only superficial interpersonal interactions with the public or co-workers (Tr. 21).

The residual functional capacity determined by the ALJ was supported by the findings of expert state agency psychologists Drs. Voyten and Haskins (Tr. 55-58, 86-92), whose opinions the ALJ accepted as consistent with the record. *See*, *e.g.,* 20 C.F.R. Sections 404.1527(d)(2), 416.927(d)(2); *Bayley v. Comm'r of Soc. Sec.*, 2011 WL 1136228, at *10 (N.D. Ohio March 29, 2011). State agency reviewing physicians and psychologists, the regulations explain, are "highly qualified" physicians and psychologists and also "experts in Social Security disability evaluation." 20 C.F.R.

17

Sections 404.1527(e)(2)(I), 416.927(e)(2)(I).  Accordingly, ALJs "must also consider findings and opinions of State agency medical and psychological consultants[.]" *Id.*

A majority of Dr. Faust's report *was* consistent with the state agency psychologists' opinions. Hence, both the state agency psychologists and the ALJ limited Plaintiff significantly to account for various deficits, including many of the deficits that Dr. Faust identified.  However, Drs. Voyten and Haskins had the benefit of a review of the broader record, and translated the various psychological findings they accepted from Dr. Faust's report into a residual functional capacity assessment, describing the work-related tasks that Plaintiff was able to do despite her impairments. *See,* Tr. 57-59, 90-92.

Finally, Plaintiff's contention of totally debilitating mental limitations was contradicted by a record of minimal mental health treatment.  Nor did Plaintiff ever undergo a psychiatric hospitalization for her symptoms (Tr. 608).  The ALJ correctly concluded that Plaintiff "failed to follow-up on recommendations made by treating sources, which suggests that the symptoms may not have been as serious as has been alleged in connection with this application and appeal" (Tr. 18).

Substantial evidence supports the ALJ's conclusion that, although Plaintiff was somewhat limited by her mental impairments, she was able to perform a range of work within the limitations he described.

## **VIII.  CONCLUSION**

Based upon a review of the  record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional

capacity (RFC) to perform her past relevant work as a car washer, and, therefore, was not disabled. Hence, she is not entitled to DIB and SSI.

Dated: May 21, 2014  /s/*George J. Limbert*
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE